**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RAHUL SHAH, MD ON ASSIGNMENT OF MARY A., | 1:17-cv-00632-NLH-AMD |
| Plaintiff, | **OPINION** |
| v. | |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, | |
| Defendant. | |

**APPEARANCES**:

MICHAEL GOTTLIEB
CALLAGY LAW PC
650 FROM ROAD
SUITE 565
PARAMUS, NJ 07652
    On behalf of Plaintiff

MICHAEL E. HOLZAPFEL
BECKER LLC
354 EISENHOWER PARKWAY
SUITE 1500
LIVINGSTON, NJ 07039
    On behalf of Defendant

**HILLMAN, District Judge**

    This matter concerns claims by an out-of-network physician, as assignee of his patient's rights, against a benefits plan for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., when the plan paid him less than $10,000 for what he valued to be a $217,000 elective

spinal surgery.

Defendant has moved for summary judgment in its favor on all of Plaintiff's claims, arguing that it is entitled to judgment in its favor that it did not act arbitrarily and capriciously when it reimbursed Plaintiff according to its plan terms regarding payment to out-of-network providers. For the reasons expressed below, Defendant's motion will be granted.

## BACKGROUND

On August 27, 2014, Plaintiff, Rahul Shah, M.D., performed a non-emergency, elective, outpatient spinal surgery on his patient, Mary A. The patient is a participant and beneficiary of a health benefit plan sponsored by her spouse's employer (the "Plan." The plan is administered by Defendant, Horizon Blue Cross Blue Shield of New Jersey, and it is governed by ERISA. For reason explained more fully below, Defendant describes the plan it had in place for Mary A.'s spouse's employer as a "70/30 plan" as it relates to out-of-network providers.

At the time of the surgery, Plaintiff was an out-of-network provider under the Plan. The patient assigned her rights to benefits under the Plan to Plaintiff, who then filed for reimbursement for the surgery. Plaintiff submitted a claim for $217,363.00, and the Plan paid Plaintiff $9,762.95. Plaintiff followed the Plan's appeal process, with the Plan ultimately concluding that the reimbursement amount was properly calculated

2

at the rate prescribed by the Plan.

Plaintiff claims that Defendant violated ERISA § 502(a)(1)(B), demanding additional benefits owed to him, and ERISA § 404, for Defendant's alleged breach of fiduciary duty.[1] Plaintiff seeks $207,600.05 in unpaid benefits, plus interest, attorney's fees, and costs. Defendant has moved for summary judgment in its favor, and Plaintiff has opposed Defendant's motion.

## **DISCUSSION**

### **A. Subject matter jurisdiction**

Defendant removed this action pursuant to 28 U.S.C. §§ 1331, 1441(a) & (c), and 28 U.S.C. § 1446 to this Court from the Superior Court of New Jersey, Law Division, Cumberland County. Federal question jurisdiction exists in this matter pursuant to 28 U.S.C. § 1331, which provides that the district court has original jurisdiction of "all civil actions arising under the Constitution, laws or treaties of the United States." Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., further provides that the district courts of the United States shall have at least concurrent, and sometimes

---

[1] Plaintiff's complaint also asserted a count for breach of contract under state law and a count for the violation of 29 C.F.R. § 2560.503-1, which is an ERISA timing and disclosure regulation governing the claims adjudication and appeals process. Plaintiff has agreed to dismiss those claims. (See Docket No. 11 at 7.)

exclusive, jurisdiction over the ERISA causes of action pleaded in the complaint. 29 U.S.C. § 1132(e)(1).

**B.   Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating

4

the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.  Analysis**

Plaintiff - who stands in the shoes of his patient through the assignment of benefits - seeks benefits he claims he is owed under the Plan, and claims that Defendant violated its fiduciary duty by failing to pay him the benefits owed.  These claims are governed by ERISA § 502(a)(1)(B), which allows a plan participant or beneficiary to bring a civil action to, among other things, "recover benefits due to him under the terms of his plan," 29 U.S.C. § 1132(a)(1)(B), and § 404 of ERISA, which provides that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . [by] providing benefits to participants and

5

their beneficiaries," 29 U.S.C. § 1104.

This Court's standard of review for claims alleging violations of these provisions is an abuse of discretion standard. See Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012) (citations omitted) (explaining that when an ERISA plan grants its administrator discretionary authority, as in the case here, the deferential standard of review is appropriate, and an administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law). Thus, the issue to be decided is whether Defendant was arbitrary and capricious in its interpretation of the plan and resulting payment to Plaintiff. The Court finds that Defendant did not abuse its discretion in this case.

The plan determined that as an out-of-network provider, Plaintiff was entitled to 70% of 150% of the Medicare-prescribed amount for the same services.[2] Defendant points to the following

---

[2] As discussed more fully below, the plan and attendant documents also clearly indicate that the provider may bill the plan participant 30% of the amount determined to be 150% of the Medicare-prescribed amount. This is because the plan participant has a co-insurance (or perhaps more accurately a self-insurance) obligation of 30% of the same allowance under the plan payable to out-of-network providers. This provides an incentive for participants insured under the plan to choose in-network providers who have agreed by contract with Defendant to provide services at a reduced rate. Of course, 70% plus 30% equals 100%. This is because under the view of the plan, the out-of-network provider is, of course, entitled to 100% (or

6

provisions in the plan to support its determination:

If a member receives a "Covered Service" from an out-of-network provider, then the plan will pay a percentage of the "Covered Charge," "up to the Allowance."[3] (Docket No. 11-3 at 31, Plan Definitions.) The "Allowance," in turn, is "an amount determined by Horizon BCBSNJ as the least of the following amounts: (a) the actual charge made by the Provider for the service or supply; (b) in the case of In-Network Providers, the amount that the Provider has agreed to accept for the service or supply; or (c) in the case of Out-of-Network Providers, the amount determined as 150% of the amount that would be reimbursed for the service or supply under Medicare." (Id. at 28, Plan

---

stated differently all) of the allowance under the plan for his services (70% directly from the insurance company and 30% from the patient). It does not help for merely simplicity and ease of calculation purposes that in order to calculate the actual amount of the doctor's fee payable directly from the insurance company one must: a) determine the Medicare rate for the coded service; b) determine 150% of that amount; and c) determine 70% of the amount of (b). That this process takes several steps as outlined in the clear terms of the plan and some elementary math does not, as Plaintiff contends, make it indecipherable, vague, or unfair. In fact, it is clearly what Mary A.'s spouse's employer bargained for when it engaged Defendant to administer the health insurance plan. A reasonable person may wonder what Mary A.'s premiums and, if it were an employer subsidized plan, what Mary A.'s spouse's employer share of the premiums would be if an out-of-network medical provider could subjectively set the value of its own services and then demand 70% of that amount.

[3] The definitions section of the plan explains, "Covered Charges: The authorized charges, up to the Allowance, for Covered Services and Supplies." (Docket No. 11-3 at 31, Plan Definitions.)

Definitions.)

"Coinsurance" is the "percent applied to Covered Charges (not including Deductibles) for certain Covered Services or Supplies in order to calculate benefits under the Program. These are shown in the Schedule of Covered Services and Supplies. The term does not include Copayments. For example, if Horizon BCBSNJ's Coinsurance for an item of expense is 70%, then the Covered Person's Coinsurance for that item is 30%." (Id. at 30, Plan Definitions.) Defendant contends that the plan provided for, and properly paid Plaintiff for, 70% of 150% of the Medicare-prescribed amount for the same services. Defendant further states that Plaintiff does not dispute that he was paid that amount.

Plaintiff, however, contends that he should have been paid 70% of his charges - as he himself calculates them - without reference to any other provision in the Plan. Plaintiff's argument is based simply and exclusively on the plan's "Schedule of Covered Services and Supplies," which states: "Surgical Services – Out-of-Network - Outpatient - Subject to Deductible and 70% Coinsurance." (Docket No. 11-3 at 56, SCHEDULE OF COVERED SERVICES AND SUPPLIES, A. COVERED BASIC SERVICES AND SUPPLIES.) Plaintiff argues that having to unpack, like Russian

nesting dolls,[4] the provisions buried in the plan relied upon by Defendant is deceptive and constitutes a breach its fiduciary duties.[5]

---

[4] Plaintiff refers to another case pending in this district, where the court denied Horizon's motion to dismiss on the issue of the validity of an ERISA benefits plan's anti-assignment clause. The court in that case denied Horizon's motion to dismiss, finding that the "anti-assignment clause forces the reader to undertake a Russian-nesting-doll-like inquiry, where each provision reveals yet another term or exception defined elsewhere in the Plan. And when the reader finally reaches the ostensible end of this multi-step inquiry, there is still no clear answer as to what constitutes an 'Eligible Charge.'" University Spine Center v. Horizon Blue Cross Blue Shield of New Jersey, 2017 WL 3610486, at *3 (D.N.J. Aug. 22, 2017). Even though Plaintiff uses the nesting doll analogy in this case, the procedural posture of, and precise issue before, the court in the University Spine Center case is very different from the matter here. Nevertheless, this Court credits the nesting doll analogy to describe the need to consider several provisions in the plan at issue in this case to form the basis for Defendant's determination of Plaintiff's claim. The difference in this case, however, is that at the end of the multi-step inquiry, a clear answer is found.

[5] Plaintiff also argues that despite Defendant's contention that it reimbursed Plaintiff in accordance with the plan's terms (70% of 150% of Medicare rates), two of the billed treatment codes – CPT Codes 20936 and 20930 – did not contain a Medicare reimbursement rate at the time of the subject treatment. Under the terms of the plan, treatment codes not priced by Medicare are reimbursed at UCR rates ("usual and prevailing payments made to providers for similar services"). Plaintiff claims that his billed charges are consistent with UCR as they are specifically based on a UCR database, but that Defendant's reimbursement for the codes that fall under this criterion was woefully short of UCR, resulting in the reimbursement of approximately 9% of his charges for the two applicable treatment codes. Plaintiff argues that these two treatment codes present another example of Defendant's arbitrary and capricious payment determination. To support his argument, Plaintiff points to Exhibit E in his complaint - his October 14, 2016 second notice of appeal letter to Defendant - which is simply Plaintiff's request that

9

Plaintiff's self-serving interpretation of the Plan myopically ignores the clear inter-relationship and correlation between sequential Plan provisions and is so lacking in support from the terms of the Plan itself as to be borderline frivolous.

First, even accepting Plaintiff's characterization that the provisions in the plan regarding payment for an out-of-network out-patient surgery must be "unpacked," that does not mean that the plan acted in an arbitrary and capricious manner when it paid Plaintiff's claim in accord with those provisions. The Plan language provides that for an out-of-network surgery, the Plan will pay 70% of allowable charges, and those allowable charges are 150% of the Medicare rates, with the plan participant owing 30% of 150% of the Medicare rates to the provider as co-insurance if the provider chose to bill the participant for the additional amount. As assignee of the Plan participant's benefits, Plaintiff is therefore entitled to no more than 70% of the 150% of the Medicare rates directly from Defendant.

Although the Plan language is required to be read in reference to several defined terms of the Plan, the lack of one

---

Defendant provide him with documentation it believes supports its determination of UCR. (Docket No. 1 at 38.) It does not provide proof that Defendant's reimbursement did not comply with UCR. Thus, the Court finds that Plaintiff has not set forth sufficient proof to support his claim that Defendant abused its discretion as to these two treatment codes.

10

compound sentence linking those terms does not cause the Plan's decision to be erroneous. Moreover, Plaintiff's disagreement with the fairness of the reimbursement terms under the Plan does not render the Plan's decision, which followed those terms, to be in error. See, e.g., Shah v. Horizon Blue Cross Blue Shield Of New Jersey, 2018 WL 801584, at *5 (D.N.J. 2018) ("A Plan that requires a careful reading is not, without more, inherently deceptive or misleading.")[6]; Professional Orthopedic Associates, P.A., et al. v. Horizon Blue Cross Blue Shield Of New Jersey, 2017 WL 1838875, at *3 (D.N.J. 2017) (where a plan participant underwent elective spinal surgery with an out-of-network physician who was reimbursed at 250% of the amount that would be paid pursuant to the fee schedule developed by CMS, finding that the plan based its determination on the plain language of the plan, and that the reimbursement was consistent with the express language of the plan, despite the physician's argument that the payment was significantly below the usual and customary rate for the surgery performed) (citing N.J. Back Inst. v. Horizon Blue Cross Blue Shield Ins. Co., 2014 WL 809164, at *4 (D.N.J. 2014) (granting summary judgment to a health benefit plan in a

---

[6] In that case, which involves the same Plaintiff as in this matter and similar surgical services, a court in this District rejected the same arguments advanced by Plaintiff in this matter finding that Plaintiff was entitled, under terms of a similar "60/40" plan, to 60% of 150% of the Medicare set rate for the services rendered. Shah, 2018 WL 801584, at *3.

11

reimbursement dispute with an out-of-network provider, because the plan set forth the manner in which reimbursements were determined for out-of-network providers); Montvale Surgical Ctr. v. Horizon Blue Cross Blue Shield of N.J., Inc., 2013 WL 4501475, at *3-4 (D.N.J. 2013) (granting summary judgment to a health benefit plan in a reimbursement dispute with an out-of-network provider based upon the same aforementioned reasoning)).

Second, even though Plaintiff argues that the Plan terms are unfair and ambiguous, the claims before the Court do not require the assessment of the Plan participant's interpretation of the Plan or her reliance on certain terms in the Plan. That is an entirely different case not pleaded here.[7] See CIGNA Corp. v. Amara, 563 U.S. 421, 435-36 (2011) (finding that § 502(a)(1)(B) only grants a court the power to enforce the terms of the plan, not change the terms of the plan); id. at 443 (finding that when

---

[7] Plaintiff has not asserted a claim of equitable reformation in his complaint, and there is no evidence in the record that the Plan participant relied upon the representations by the Plan regarding the payment of benefits to Plaintiff that would support Plaintiff's contention that he was to be paid 70% of his charges. Additionally, Plaintiff has not pleaded a claim for violations of 29 U.S.C. §§ 1022(a), 1024(b) (ERISA §§ 102(a) and 104(b)), which require a plan administrator to provide beneficiaries with summary plan descriptions and with summaries of material modifications, "written in a manner calculated to be understood by the average plan participant," that are "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

a court exercises its authority under § 502(a)(3) to impose a remedy equivalent to estoppel, including reformation, a showing of detrimental reliance must be made). Plaintiff may be disappointed with the out-of-network reimbursement terms of his patient's benefits plan, which resulted in a payment that was a small percentage of Plaintiff's charges, but Plaintiff accepted the terms of the Plan when he agreed with his patient to the assignment of her benefits.

The parties are likely to agree, and it is certainly this Court's observation, that ERISA-governed employer-sponsored health plans are complicated and comprehensive documents. There are several reasons for this. There are many types of medical providers and myriad services they perform. There are many ways to set a rate for or value those services. A plan must determine what it will cover, what it will not, and what it will pay as benefits. The plans may cover large groups of employees, may cover multiple employers, and apply across state borders. They are subject, therefore, to state and federal regulation and the pressures of a competitive marketplace. They set and define processes to consider, evaluate, and pay out benefits and for administrative review of disputes. And like any well-drafted contract a plan would seek to anticipate and address all foreseeable scenarios.

When Mary A. first consulted Plaintiff about his services,

he had several options. First, he could have set what he perceived as the market rate for his services and conditioned providing his services on the payment of that fee, leaving to the patient reimbursement under applicable insurance. Second, he could have agreed to accept Mary A.'s insurance and the benefit it provided (70% of 150% of the Medicare rate for the covered service) and billed Mary for the remaining 30% of the allowed and clearly defined benefit.

What he could not do was accept the benefit under the Plan, take an assignment from Mary A. of any additional claims she might have, and through this lawsuit seek to blow up – without legal or factual support - the carefully and clearly drafted mutually beneficial agreement between Mary A.'s spouse's employer and Defendant. Plaintiff's claim that he is entitled to 70% of the fee he has set for his services as against this Defendant lacks any support in the law or the Plan terms. Despite his protestations to the contrary, as the Court can best discern, Plaintiff seeks his demanded fee of over $217,000 simply because he thinks he's entitled to it.

In sum, the clear, unambiguous, bargained for terms of the Plan provide for the exact payment Defendant paid Plaintiff. It cannot be found, therefore, that Defendant's benefits determination was without reason, unsupported by substantial evidence, or erroneous as a matter of law.

**CONCLUSION**

For the reasons expressed above, Defendant has established that the Plan did not abuse its discretion when it paid Plaintiff for his surgical services as an out-of-network provider. Consequently, Defendant is entitled to judgment in its favor on all of Plaintiff's claims.

An appropriate Order will be entered.

Date: March 27, 2018            s/ Noel L. Hillman
At Camden, New Jersey       NOEL L. HILLMAN, U.S.D.J.